AUTO PNEUMATIC ACTION CO. v. OTTO HIGEL CO., Inc.

(Circuit Court of Appeals, Second Circuit. June 13, 1919.)

No. 230.

PATENTS ⬤⟿328—FOR MECHANICAL PIANO VALID AND INFRINGED.
    The Danquard patent, No. 766,601, for a manually or mechanically operated piano, *held* not anticipated, valid, and infringed.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the Auto Pneumatic Action Company against the Otto Higel Company, Incorporated. Decree for complainant, and defendant appeals. Affirmed.

Kerr, Page & Hayward, of New York City (Thomas B. Kerr and Parker W. Page, both of New York City, of counsel), for appellant.

L. W. Southgate and O. Ellery Edwards, Jr., both of New York City, for appellee.

Before WARD, ROGERS, and MANTON, Circuit Judges.

MANTON, Circuit Judge. The appellee has obtained an interlocutory decree, in equity, granting an injunction and accounting against the appellant for infringement of patent No. 766,601 granted on August 2, 1904, to Thomas Danquard. The invention is for a manually or mechanically operated piano, in which the piano action proper and the pneumatic playing mechanism are combined in one self-contained structure, the working parts of which are supported within an ordinary piano case and may be operated manually by fingering the keyboard. It may also be played mechanically by the operation of pneumatics upon parts moving the hammers of the piano action. It is generally known as a piano player, and a large industry has been established in manufacturing it.

The patent in suit has been before this court and was declared valid and infringed in Auto Pneumatic Action Co. v. Kindler & Collins et al., 247 Fed. 323, 159 C. C. A. 417. The present suit is upon claims 26, 27, and 31, which were in issue in the case referred to, wherein the patent was declared valid. In that action the defendants, Kindler & Collins, set forth 56 alleged prior uses and some 61 patents as an anticipation of the patent in suit. Among these was the Brown player piano, constructed under patent No. 581,390, issued to Brown. This court held that Brown did not anticipate the patent in suit. In the defense interposed in this action, the defendant in effect, asks for a reconsideration of the defense of Brown's patent as an anticipation, and has endeavored to amplify its proof, with the hope that it now demonstrates that Brown's patent was an anticipation of the patent in suit; and, further, it has offered as an additional part of the prior art the French patent to Thibouville-Lamy. It will only be necessary for us to consider the effect of this amplification of proof, together with what is urged in the present argument, and also the effect, if any, as part of the prior art, of the introduction of the French patent to Thibouville-Lamy.

The main problem of the manually played piano was the arrangement of sounding boards, frame, strings, and scale to obtain harmonious acoustic properties and the perfection of the piano action; that is, the operating mechanism between each key and hammer. As we look at the piano action to-day, it comprises a very complicated system of levers, cords, strings, and dampers balanced and accurately positioned, and so disposed that when a key is depressed, the damper will be raised from the string, the hammer thrown with a quick action against the string, and then quickly pulled away from in contact with the string, and the parts being further arranged so that, when the finger is raised from the key, the parts will assume their normal position and the damper will stop the vibration of the string. The piano action is comprised, in main part, of a rod called the manual abstract,

carried by a pivoted link and extending upwardly above the inner end of the key, which rod is pivoted to a wippen, which in turn carries a pivoted jack or trigger, which engages the butt of the hammer. The inner end of the wippen operates in a system of levers, which controls the action of the dampers, and its outer end carries a wire and cord to cause the hammer to rebound quickly, and a cushion for catching the rebound. By depressing a key of the piano, a hammer will strike and vibrate the string and play the note.

In the apparatus of the patent in suit, the striker is slotted so as to get an elastic action between the pneumatic and the action. The patent touches the connection between the exhaust bellows and the piano action and the integration of all the parts into one unital structure, which may be moved into and out of the piano case without any reorganization of its parts. An important feature is the upright rod or abstract, which, through the mediation of a pivoted piece of wood, referred to as a stricker, directly touches and moves the wippen of the piano action when the bellows is collapsed by a vacuum. By its construction, when the mechanical attachment is not in operation, the piano itself may be played as though the player was not attached, and this without any effect upon its tone.

The problem which this inventor solved was to incorporate the mechanically playing mechanism directly in the piano case itself and leave the keys in position, and uncover them, so that the piano can be played manually in the ordinary way and mechanically by operating the player mechanism. That he has succeeded is evidenced by the phenomenal success manufacturers have had under the Danquard invention.

At the trial below, Brown's relation of the manufacturer of piano players, and the result of the effort to manufacture and sell pianos made under the Brown patent, is given in considerable detail; but the result does warrant the conclusion that pianos made under the Brown patent were not successful, and they did not meet the demands of the trade. In the Brown structure, extending down from the pneumatics, are wire pullers on their bottom ends, which wires fit loosely into slots in brackets or to the keys. There is a separate angle lever on each manual abstract or piano key. Brown's mechanism could be removed and replaced as a unit, but replacement was an extremely difficult matter, for it involved the correct insertion of the ends of the wire pulleys, 65 in number, into the slots of the angle levers; and, while this could be accomplished, the difficulty was the fact that the installation of the player mechanism destroyed the touch of the piano action. The angle lever will affect the touch, for it adds weight. The manual abstract is a light vertically extending strip of wood, and there is difficulty in attaching these angle levers thereto, as they have to receive all the blows of the pneumatics when the instrument is playing mechanically. The touch will be affected by the fact that the angle levers have to slide on the wires when the piano is played manually. The patent says:

"In case the keyboard is played manually, the depression of the keys at their front ends will free the buttons on their rear ends, raise the abstract to operate the hammer, and the angle lever will slide loosely on the pin without moving the same."

There is also the danger of the wires being bent or rusted, and if this should occur to the least degree, the depression of the key might be impossible or gravely interfered with. If the player action should be taken out and put back, or if it should be attempted to handle the player action as a unit, it would be inevitable that some of these 65 wires would become bent.

Brown modified the action from that provided in the patent. Instead of putting the angle levers on the manual abstracts, the middle levers are carried by the lower ends of the manual abstracts, and are extended and made in the form of what is now called the boot jacks; but still the wires extend through the slots in these boot jacks, and when the action was put in place they had to slide therein during the manual playing, and this construction likewise spoiled the touch of the piano, particularly if the wires should be a little bent, so that they would not be perfectly safe. This would afford frictional interference to the playing of the key, and also frictional resistance against the rebound of the hammer, so that the quick repetition of the key would be difficult in actual playing, and would likewise give a lack of uniformity of touch throughout the entire keyboard. To attempt to get the modified device to operate properly, a series of stops were arranged as part of the piano above these boot jack levers. When the piano is assembled, they are inaccessible, and to adjust the same the player action has to be taken out, and an adjustment of mechanical playing cannot be made, as the mechanical mechanism is not in place. These stops not only come into action when the piano is playing mechanically, but they are operative when the piano is played manually by depressing the keys. They added another complication, and tended to spoil the touch of the piano keys, because they interfered with the action of the stops upon the front end of the keys. These were the reasons why the Brown modified structure was not successful or desired in the trade. We find nothing in this additional or amplification of the proof to warrant a change of the court's conclusion, in the Kindler Case, that the Brown patent did not anticipate the patent in suit.

The French patent was an effort to do away with the cabinet, and this the patentee states. There the inventor removes the front of the casing, the keyboard, and the keys of a manually operated piano. He removes the abstracts and supporting levers, and attaches a player mechanism solidly built into a new shaped casing. The player mechanism comprises a series of folding jointed leaves which are progressively carried across the front of the casing and which leaves trip little levers. This crosswise arrangement is necessary, owing to the length of the mechanism it takes to manipulate these folding cardboard leaves. By this construction there is built an auto piano without a keyboard, for the keyboard and keys have been entirely removed and the piano action has been mutilated; that is, the abstracts, supporting levers, and rail are removed to get the bellows and pneumatics in place in front of the strings below the piano action. It is not known what effect it would have upon the touch, for that is removed.

The appellant, however, insists that there might be rebuilt keys and keyboard in front of the actions, and thus retain the capability of manual playing, and therefore anticipate the patent in suit. The evidence does not warrant a finding that this could be done practically and that it would be operative. There is nothing to support the lower ends of the assumed manual abstracts. If they are spaced to be attached to the keys, the action will be ripped to pieces, if it were attempted to remove the supplemental casing. At any rate, it could not anticipate the Danquard, nor the claims here in suit. The structure has no grip devices adapted for removal together from the instrument case. It has no tracker and music sheet rolls, as provided in claims 26 and 27, and there are no adjustable stops regulating the movement of the action by the pneumatics and strikers, as stated in claim 27.

We think that this patent adds nothing new to the prior art over that which was previously considered by this court in the Kindler Case, and that it does not anticipate the patent in suit.

The only other patent which we deem it necessary to consider is that of the Gulbransen device. There the piano action abstracts were provided with angle levers, which, instead of being operated by pullers, were engaged by arms or wings attached to the underneath sides of the movable levers of the pneumatics. The efforts of Gulbransen to successfully manufacture any development of this idea have failed. Gulbransen says that, "while his construction is different, the principle is the same as that of the Brown patent," and the appellant has argued that it is a development of the Brown patent. It has no pins with buttons to pull up through brackets attached to the abstracts or keys as Brown has. In the Gulbransen structure, brackets were attached to the piano abstracts, and these brackets were engaged directly by wings or projections from the pneumatics and there were no pullers. Its nonsuccess resulted. A difficulty he was unable to overcome was in attaching these brackets to the abstracts. The attachments varied in weight, and, even if properly balanced by loading each of the three keys differently, the operation of each of the three adjacent keys would be different; the touch of the piano was spoiled, because it is essential to the touch of the piano that the operation of all of the keys on action would be exactly the same. Gulbransen tried for 11 years to make a practical device, and has not been successful.

We think the new evidence, or amplification of the old, adds nothing to that which has been previously considered.

Decree affirmed.